IN THE UNITED STATES COURT OF FEDERAL CLAIMS

AGEE, TIMOTHY T., et al.

Plaintiffs,

v. Case No. 04-1575C

Judge Wheeler

THE UNITED STATES,

Defendant.

Monday,
February 27, 2006

ORAL DEPOSITION OF:

LINDA M. GREELEY

called for examination by Counsel for Plaintiffs, pursuant to notice of deposition, in the law offices of Woodley and McGillivary, 1125 15th Street, Northwest, Suite 400, Washington, D.C., when were present on behalf of the respective parties:

ORIGINAL

A Yes.
Q And that's a time-and-a-half rate of the firefighters' regular rate of pay?
A Yes.
Q Now are you familiar with offshore allowances?
A I know about offshore allowance, yes.
Q Do you know how it is determined -- what exactly is an offshore allowance, in your understanding?
A It's an allowance that is provided to an employee for unusual travel to work for an area that they work in.
Q Okay. Do you have any idea how it is determined whether or not an employee, a federal employee, is entitled to this offshore allowance?
A It's at agency discretion per the Code of Federal Regulations.
Q Okay. So it's the agency's discretion whether to follow the federal regulations?
A Whether it applies in situations for a group of employees.

Q Okay. Do you have any idea how an agency would make that determination, whether one group of employees is entitled to that offshore allowance?

A They would have to read the Code of Federal Regulations and then determine if that situation applies.

Q Have you ever provided guidance to the agency in this case regarding the offshore allowance for the firefighters assigned to San Clemente Island?

A No.

Q Do you know how the amount of the offshore allowance is determined?

A I only know if I look at the regulation and there are specific rules on how you determine the amount, and again, the agency would have to determine that.

Q So you were not involved in determining how -- what amount of an offshore allowance the employees on San Clemente Island were to receive?

A No.

Q Do you know if the firefighters assigned to San Clemente Island were entitled to an offshore

allowance?

A Do I know if they were entitled?

MR. WELLONS: I'm going to object to the extent it calls for a legal conclusion. Go ahead and answer the question.

BY MS. GREELEY:

A When I reviewed a pay record, I had seen that they had offshore allowance.

Q So the agency determined -- in your knowledge, the agency determined that these firefighters that were assigned to San Clemente Island were entitled to the offshore allowance?

A As far as I could tell looking at maybe only one or two pay records.

Q Okay. Do you know if all of the firefighters assigned to San Clemente Island were treated the same regarding the offshore allowance?

A No.

Q Do you know of any reason why they would not be treated the same?

A No.

Q I'm going to talk a little bit about the

that reflects -- what that 6 reflects?

A Well, if I'm just looking at this without any further research, I would say that is saying six days. That may not -- may or may not be true.

Q Okay.

A And is it your understanding that employees that are entitled to an offshore allowance are to be paid that offshore allowance for each day that they work?

A That's the way I understand it.

Q And then it says, if you go to the right, this is not circled, but it says, "Overtime in Tour 38," and then further to the right, there's "Overtime." Do you know what the difference between overtime -- or OT in Tour and overtime?

A Yes, on -- if this firefighter had a tour of duty of 144 hours, then you take 144 hours minus the 106 and the 38 hours is the overtime in the tour, meaning the firefighter overtime rate. Any additional overtime outside this schedule tour of duty is overtime. So if the employee worked 144 hours and he worked an additional two hours, the two hours would be

over in overtime.

Q Okay. Is there any difference in the rate of pay between overtime in tour and overtime?

A No. It's one and one-half times.

Q Okay. And just so -- get this math down so we can talk easier. 144 hours, that would be, in this case, six days of 24-hour --

A I don't know what his schedule is.

Q Okay. Do you know what the schedule of firefighters assigned to San Clemente Island, do you know what their schedule is?

A When?

Q Do you know what it is currently?

A They say it's 168.

Q Okay. And do you know if that is seven days in a row of 24-hour shifts?

A That's what they tell me.

Q Okay. Can you tell by looking at this document what their -- what Mr. Henning's tour of duty was at this date?

A I would --

MR. WELLONS: Dave, before she answers the

Q Do you know if this -- if a request for a change of work schedule for these employees to be on a 168-hour work schedule was actually made?

A A request by who?

Q Who would need to make such a request to the Control Configuration Board?

A Well, it's dependent on who is requesting it. And so normally, an SCR is written and it's passed on to the Systems Management Office.

Q An FCR?

A An SCR, system change request.

Q Oh, a system change request, okay. Okay. Do you know who did this -- who made the system change request for the San Clemente Island work schedule?

A You mean before it was approved, after it was approved, when it was trying to get approved?

Q Who -- well, I guess, do you know what the approval process is? Can you walk me through that?

A In my opinion, what the approval process for a schedule change like this would be the agency would -- where the supervisor that wants a schedule change that is not just the regular compressed or

flexible schedule would have to request through chain of command, which would be through Navy, up to Navy Headquarters. Navy Headquarters would send it to Department of Defense, which would be Steve Rumble's group, Civilian Personnel Management, and they would yay or nay it, and then once it's approved, if it meant that it had to have a systems change both on DPCDS or DCPS, they would let us know and an SCR would be written for either or both systems.

Q And who would write the SCR at that point. Would that be Steve, or would that be something you would do?

A I could get the requirements for Steve, I could do it, or our systems folks could do it.

Q Do you know who did this SCR for this work schedule for the San Clemente Island, that change?

A Do you mean the examples of how it should be paid or do you mean is there an SCR for this change?

Q Well, is there an SCR?

A I believe there is an SCR.

Q But you're not positive?

A Correct.

Q So, for example, you'd -- for an example of someone getting paid, it would just reflect if someone worked all seven days of that 168-hour schedule, they should be paid this straight time, this time-and-a-half?

A Correct.

Q Okay. Did that include offshore allowance?

A Correct.

Q It did?

A Correct.

Q Do you know if it included six days of offshore allowance or seven days?

A With a 168-tour, it included seven days.

Q Was the offshore allowance included in the regular rate?

A No.

Q And you also did an example for leave. Is that correct?

A Correct.

Q And that would be on how annual leave

second?

(Whereupon, the aforementioned matter went off the record briefly.)

MR. RICKSECKER: Back on the record. We are taking the time to block out the Social Security number that was reflect on this document. If you would like, I could do that on your copy, as well.

BY MR. RICKSECKER:

Q Let's also take a look here, for the -- it says, "Remote site days: 6.0." Does that reflect to you that that's -- that reflects six days?

A If I look across here.

Q Okay.

A And I could guess that six days were there, but there was an adjustment, because he got more, so that could be seven days. Whatever the rate of pay -- the rate of remote site allowance, so if we take six days times, what was it, 9.50 and some of that other stuff, what does that come out to?

Q 6 times 9.50 would be 57, but 6 times --

A But then 7 times 9.50?

Q That would be 66.5.

A Right, so if I was guessing, I would say that he was paid seven days of remote site allowance at 66.50.

Q Okay. Going along here, this is -- subject to retirement, is that the amount of salary that's subject to retirement?

A Correct?

Q Is that also referred to as basic pay?

A Not necessarily.

Q What is basic pay?

A It's mostly -- the definition is in the CFR, so you should look up the definition, but it would be whatever's in the CFR.

Q And this is retirement deduction first. Is that correct?

A Correct.

Q And then subject to TSP, that's Thrift Savings Plan?

A Correct.

Q CPS deduction, is that Thrift Savings Plan deduction? Is that correct? Or the DED?

A Yes. I mean, this would say this person

elected three percent.

Q Okay. And then going across the top, we're looking at -- there's 168 adjusted, and then 144 DCPS. What is 144 DCPS?

A If I am assuming correctly, this would be what the system calculated, based on 144 hours, for this gentleman, because we don't have the 168-hour tour of duty in the system. So this would be -- all calculations on the right-hand side would be what the system came up to based on 144 hours. On the column adjusted would be what the manual work-around procedures came up with, based on the 168-hour tour of duty.

Q Okay. Is this something -- is this document something that is created whenever there is a manual adjustment to the system?

A No. I would probably say that since we were doing a manual work-around, that either the customer service rep at San Clemente or whatever, or our payroll office, came up with this sheet to explain to the firefighter or the employee, whatever it is, how their pay was calculated.

Q Okay. You said that you briefly reviewed the examples that you created for this manual systems change before the deposition. Is that correct?

A Correct.

Q What other documents did you review for this -- in preparation for this deposition.

A 5 CFR 551, 5 CFR 591.

Q Okay, besides the CFRs and the examples, you didn't review any other documents?

A I asked for a document. I asked for the manual spreadsheets that calculate each pay period, but I didn't have a chance to review them.

Q Manual spreadsheets for the individuals that are employed on --

A I asked for one particular person. That's the only name I could remember.

Q Was that Michael Henning?

A Yes.

(Laughter.)

Q Okay. So you requested his -- the manual spreadsheets for what he has been paid and what is created by the system. Is that correct?

reflected in this letter?

MR. WELLONS: I'm going to object as vague. Go ahead and answer.

BY MR. RICKSECKER:

Q Well, for example, does leave accrue in a different manner if you're a 168-hour employee compared to a 144?

A Correct.

Q This also -- I'd like to ask a question about this letter. The very first sentence of the second -- under the background section, the second paragraph, it says, "With the new work schedule change for SAN CLEMENTE ISLAND firefighters, they now work seven days on and seven days off." Is it permitted for the agency to change an employee's work schedule without getting the required approval?

MR. WELLONS: Objection. Calls for speculation, calls for legal conclusion, vague. Go ahead and answer.

BY MS. GREELEY:

A I wouldn't think so. We have to have something that's approved.

Q Once it is -- once -- if a new work schedule change has been approved, is it possible to put that change in retroactively to catch the time from the time the change was implemented to the time that it was actually approved?

MR. WELLONS: Same objection. Go ahead and answer.

BY MS. GREELEY:

A Anything can be done retroactively, it's just complicated. It's a lot of work.

Q Are there -- is there any certain authority or approval that's necessary to make a retroactive change?

A Yes, something -- we'd have to have legal approval.

Q Here it says, just read down a little bit, "In talking with DFAS, they stated they cannot pay as requested, that this is a change that requires an SF-50 personnel action." Do you recall if you were involved with that conversation regarding an SF-50?

A Not at all.

Q And are you involved with -- do you inform

## CERTIFICATE

This is to certify that the foregoing proceedings

in the matter of: The Deposition of
Linda M. Greeley

held on: February 27, 2006

at the location of: Washington, D.C.

were duly recorded and accurately transcribed under my direction; further, that said proceedings are a true and accurate record of the testimony given by said witness; and that I am neither counsel for, related to, nor employed by any of the parties to this action in which this deposition was taken; and further that I am not a relative nor an employee of any of the parties nor counsel employed by the parties, and I am not financially or otherwise interested in the outcome of the action.

Neal R. Gross

Notary Public/Reporter in and for

District of Columbia

My commission expires

03/31/06